**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

**v.**

**JOHN BECK AMAZING PROFITS,**
**LLC, et al., Defendants.**

Case No. 2:09–cv–04719–JHN–CWx.

United States District Court,
C.D. California.

April 20, 2012.

Evan Rose, Kenneth H. Abbe, Matthew D. Gold, Federal Trade Commission, San Francisco, CA, John David Jacobs, Stacy Rene Procter, Christina Victoria Tusan, Federal Trade Commission, Los Angeles, CA, for Plaintiff.

David Robert Gabor, Judith L. Meadow, Larry C. Russ, Michael S. Brophy, Russ, August and Kaboat, David A. Kettel, Katten, Muchin, Rosenman, LLP, Poopak Nourafchan, Hogan Lovells U.S. LLP, Los Angeles, CA, J. Robert Robertson, Hogan Lovells LLP, Washington, DC, for Defendants.

**ORDER: (1) GRANTING FTC'S MOTION FOR SUMMARY JUDGMENT; (2) DENYING DEFENDANTS' MOTION IN LIMINE; AND (3) ORDERING SUPPLEMENTAL BRIEFING ON SCOPE OF INJUNCTIVE RELIEF AND MONETARY DAMAGES [350, 426]**

JACQUELINE H. NGUYEN, District Judge.

The matter is before the Court on Plaintiff Federal Trade Commission's ("FTC") motion for summary judgment or, alternatively, for partial summary adjudication ("Motion"). (Docket No. 350.) The Court will also consider and rule on Defendants'[1] motion in limine to exclude the FTC's expert survey and testimony (docket no. 426) because consideration of Defendants' objections raised in the motion in limine is necessary to the determination of the FTC's motion for summary judgment. Both motions are opposed. On November 28, 2011, the Court held a hearing on these matters, ordered the parties to submit supplemental briefings, and took the matter under submission. (Docket No. 576.) For the reasons discussed below, the FTC's motion is GRANTED. Defendants' motion in limine is DENIED.

## I. FACTUAL BACKGROUND[2]

This case involves the advertising, marketing, and sale of three wealth-creation products: (1) John Beck's Free and Clear Real Estate System (the "John Beck System"); (2) John Alexander's Real Estate Riches in 14 Days (the "John Alexander System"); and (3) Jeff Paul's Shortcuts to Internet Millions (the "Jeff Paul System"). These products were marketed through Defendants' infomercials, which the FTC contends were deceptive.

### A. *THE DEFENDANTS*

Hewitt and Gravink, the founders and sole members of FP, directly or indirectly owned and controlled the corporate defendants in this lawsuit.[3] Hewitt and Gravink

---

**1.** Individual defendants Gary Hewitt ("Hewitt"), Douglas Gravink ("Gravink"), John Beck ("Beck"), John Alexander ("Alexander"), and Jeff Paul ("Paul"), and corporate defendants Mentoring of America, LLC ("MOA"); Family Products, LLC ("FP"); John Beck Amazing Profits, LLC ("JBAP"); Jeff Paul, LLC; and John Alexander, LLC are

collectively referred to herein as "Defendants."

**2.** The facts are not in dispute unless otherwise indicated.

**3.** D. Gravink Decl. ¶ 2, docket no. 5448; Answer ¶ 13, Am. Answer ¶ 13, docket no. 219.

made the final decisions on all the infomercials at issue.[4] FP advertised, marketed, telemarketed, and sold each of the "systems" in this action.[5] FP, in turn, was the sole member of Defendants MOA, JBAP, John Alexander, LLC, and Jeff Paul, LLC (also d/b/a Shortcuts to Millions).[6] MOA telemarketed and sold personalized coaching programs for the systems.[7]

Defendant Beck is the "originator" or developer of the John Beck System that was advertised in the 2005 and 2007 John Beck infomercials (hereinafter, the 2005 John Beck infomercial and the 2007 John Beck infomercial, respectively).[8] Beck appeared in these infomercials.[9] JBAP marketed the John Beck System.[10]

Defendant Alexander is the "originator" or developer of the John Alexander System that was advertised in an infomercial that aired from approximately November 2005 until approximately mid–2007.[11] Alexander appeared in the John Alexander infomercial.[12] John Alexander, LLC marketed the John Alexander System.[13]

Defendant Paul is the co-creator and primary spokesman for the Jeff Paul System that was advertised in the 2007 and 2008 Jeff Paul infomercials (hereinafter, "the 2007 Jeff Paul infomercial" and "the 2008 Jeff Paul infomercial," respectively).[14]

Paul appeared in the Jeff Paul infomercials.[15] Jeff Paul, LLC marketed the Jeff Paul System.

## B. DEFENDANTS' BUSINESS PRACTICES

Defendants marketed the products using infomercials aired nationwide and on the Internet.[16] Each of these infomercials advertised a "system" that costs $39.95, plus shipping and handling, and consists of a front-end kit of educational materials—including written materials, DVDs, and/or CDs—and a purportedly free month-long membership in a value-added "club." [17]

Since at least 2004, Defendants have aired at least two versions of the John Beck System infomercial.[18] The John Beck System teaches consumers how to buy real estate at government tax foreclosure sales by paying the delinquent back taxes owed on the property.[19] The FTC alleges that the infomercials falsely represent that consumers can use the John Beck System to quickly and easily earn substantial amounts of money by purchasing homes at tax sales in their area "free and clear" for just "pennies on the dollar," and then turning around and selling these homes for full market value or renting them out for a profit.[20] Moreover, the

4. D. Gravink Decl. ¶ 3.

5. Am. Answer ¶¶ 10–12.

6. Gravink Decl. ¶ 2. (Docket No. 448.)

7. Am. Answer ¶ 8.

8. J. Beck Decl. ¶¶ 1, 14. (Docket No. 443.)

9. Am. Answer ¶ 15.

10. Id. ¶ 5.

11. Alexander Decl. ¶ 1. (Docket No. 441.)

12. Am. Answer ¶ 16.

13. Id. ¶ 6.

14. Paul Decl. ¶ 1. (Docket No. 455.)

15. Am. Answer ¶ 17; Paul Decl. ¶ 6.

16. Opp'n 8; Am. Answer ¶ 22.

17. Am. Answer ¶ 22.

18. Id. ¶ 24.

19. DVD of John Beck infomercials, docket no. 6; Russ Decl. ¶ 5, docket no. 460; Compl. ¶ 25, docket no. 1.

20. Compl. ¶ 25.

infomercials represent that consumers who purchase the system would receive a free 30–day membership to "John Beck's Property Vault." However, the infomercials fail to adequately disclose that "John Beck's Property Vault" is actually a continuity plan which, upon expiration of the free trial period, charges consumers $39.95 per month unless consumers take the affirmative step of canceling their memberships.[21]

Similarly, Defendants also aired the "John Alexander's Real Estate Riches in 14 days" infomercial.[22] The infomercial markets materials on Alexander's "inverse ownership system" of acquiring real estate.[23] Under the "inverse ownership system," consumers put together real estate transactions and get "the cash out at closing" without using any of their own money or credit.[24] The infomercial falsely represents that consumers will be able to complete an inverse purchase transaction within 14 days.[25] The FTC alleges that Defendants falsely represent that consumers who purchase this system would receive a free 30–day membership to "John's Club," Alexander's hotline advisory service. However, the infomercial fails to adequately disclose that "John's Club" is actually a continuity plan which, upon expiration of the free trial period, charges consumers $39.95 per month unless consumers take the affirmative step of canceling their memberships.[26]

Since at least January 2006, Defendants have also aired at least two versions of the "Jeff Paul's Shortcuts to Internet Millions"

infomercial.[27] The infomercials market materials on "proven, turnkey internet businesses," a system that is "so simple that consumers do not need any prior experience with internet business to make it work."[28] The FTC claims that consumers who purchase the Jeff Paul System receive a free 30–day membership to "Big League," also known as Jeff Paul's "Internet Millionaires Club," a service that includes seminars and access to advisors who can answer consumers' questions. However, the FTC alleges that the infomercials did not adequately disclose that "Big League" is actually a continuity plan which, upon expiration of the free trial period, charges consumers $39.95 per month, unless consumers take the affirmative step of canceling their memberships.[29]

On June 30, 2009, the FTC brought this suit against Defendants, alleging violation of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a) (hereinafter, "Section 5") based on Defendants' representations in connection with the advertising, marketing, promoting, offering for sale, or sale of the John Beck System (Claim 1), the John Alexander System (Claim 3), and the Jeff Paul System (Claim 5). The FTC also alleges Section 5 violations based on Defendants' representations in connection with the "continuity membership plans" (Claims 2, 4, and 6) and the sale of coaching programs (Claim 7). In addition, the FTC claims that Defendants violated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.3(a)(1)(vii), 310.4(a)(6), and 310.4(b)(1)(iii)(A), by fail-

21. *Id.* ¶¶ 33–34.

22. Am. Answer ¶ 48.

23. Stahl 6th Decl., Attach. 4, DVD of John Alexander infomercial, docket no. 521; Russ Decl. ¶ 5.

24. Compl. ¶ 49.

25. *Id.*

26. *Id.* ¶ 64.

27. Am. Answer ¶ 64.

28. DVD of Jeff Paul infomercials, docket no. 6; Russ Decl. ¶ 5; Compl. ¶ 65.

29. Compl. ¶ 69.

ing to adequately disclose the enrollment of consumers in continuity membership plans (Claims 8, 10, and 12); by submitting payment information of consumers without their express consent (Claims 9, 11, and 13); and by placing outbound calls to consumers who previously stated that they do not wish to receive calls from Defendants (Claim 14). The FTC seeks injunctive relief as well as equitable monetary relief in the amount of $300 million.

The FTC now moves for summary judgment.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows a party to move for summary judgment of a claim or defense. Fed.R.Civ.P. 56(a). Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.; see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the initial burden of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once the moving party has met this initial burden, the burden shifts to the nonmoving party to present evidence showing that a genuine issue of fact remains. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then summary judgment is proper. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Where the opposing party is able to identify specific, relevant facts evidencing a genuine issue of material fact, the court must draw all inferences in favor of the opposing party and accordingly deny summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987).

## III. EVIDENTIARY OBJECTIONS

### A. *DEFENDANTS' EVIDENTIARY OBJECTIONS*

#### 1. Objections to Beck and Alexander Consumer Declarations

 In connection with its claims relating to the John Beck System, the FTC has filed, *inter alia,* 14 consumer declarations consisting of approximately 200 paragraphs. (Docket No. 369.) In connection with its claims pertaining to the John Alexander System, the FTC has filed, *inter alia,* 16 consumer declarations consisting of over 100 paragraphs. (Docket No. 370.) Defendants object to almost every paragraph on various grounds, including best evidence, relevance, lacks foundation, hearsay, argumentative, and lack of opportunity to cross-examine the declarants. (Docket Nos. 408, 409.) The FTC filed a response addressing each objection. (Docket Nos. 484, 502.) These objections are **OVERRULED.**[30]

#### 2. Objections to the Declarations of Former MOA Employees

Defendants object to almost every paragraph of the declarations made by the

---

**30.** The statements made by the telemarketers are party admissions that are non-hearsay

under Rule 801(d)(2)(D) of the Federal Rules of Evidence (hereinafter, "FRE"). Further,

following former employees of MOA: (1) Tabatha Contreras, (2) Brenda Fox, (3) Segun Hinckson, and (4) Timothy Lawson.[31] The FTC filed a response to these objections.[32] To the extent the Court relies on any evidence to which Defendants object, the objections are **OVERRULED** for the reasons discussed in the FTC's responsive pleadings.

### 3. Objections to Various Declarations

Defendants object to portions of the Gordon Declaration and Attachment 1 to that declaration. (Docket Nos. 333, 414, 487, 543.) Attachment 1 is an Excel spreadsheet summarizing consumer complaints relating to the John Beck System, John Alexander System, and Jeff Paul System. Defendants also object to portions of the (1) Fifth Stahl Declaration[33]; (2) Sixth Stahl Declaration[34]; (3) Billings Declaration[35]; (4) Papenfuss Declaration[36]; and (5) Williams Declaration.[37] The Court need not address these objections because the Court did not rely on any portion of the evidence to which Defendants objected.

### 4. Objections to the McClellan Declaration

Defendants object to portions of the declaration made by Charles McClellan, a consumer who purchased an introductory Jeff Paul Kit. (Docket Nos. 371, 419, 505.) To the extent that the Court relied on paragraph 7 of the McClellan Declaration, Defendants' objection is **OVERRULED** because the declarant has personal knowledge of his conversation with the telemarketer and the statements made by the telemarketer were non-hearsay party admissions. The Court need not rule on Defendants' objections to other portions of the declaration because the Court did not rely on them.

### 5. Objections to the Rose Declaration

Defendants object to portions of the Rose Declaration. (Docket Nos. 342, 420, 506.) The Court **OVERRULES** the objections to Paragraph 5 of the declaration for the reasons stated by the FTC on its response. (Docket No. 506.) The Court need not rule on Defendants' objections to other portions of the declaration because the Court did not rely on them.

### 6. Objections to the Declarations of the FTC Attorneys

Defendants object to almost every paragraph of the declaration made by Jennifer Brennan. (Docket Nos. 421, 490, 537.) Defendants also object to portions of the declaration made by John Jacobs. (Dock-

---

as the Court explained in its 11/17/2009 Order, 2009 WL 7844076, Defendants' best evidence objection is without merit because these declarations do not seek to establish the contents of the infomercials or program materials. Instead, the declarations are relevant to show the consumer's understanding of the statements made in the infomercials and materials. The remaining grounds for Defendants' objections are equally without merit, and it is unnecessary and unduly burdensome for the Court to address these objections individually. Accordingly, to the extent that the Court relied on portions of declarations that have been objected to, such objections are OVERRULED for the reasons stated in the FTC's response.

**31.** Docket Nos. 373, 410, 411, 412, 413.

**32.** Docket Nos. 485, 486, 513, 514.

**33.** Docket Nos. 367, 415, 488.

**34.** Docket Nos. 343, 416, 489, 539.

**35.** Docket Nos. 345, 417, 503, 542.

**36.** Docket Nos. 368, 418, 517.

**37.** Docket Nos. 380, 425, 516.

et Nos. 422, 504.) Likewise, Defendants object to Paragraph 5 of the Procter Declaration on the basis of hearsay and best evidence rule. (Docket Nos. 423, 332, 491.) The Court need not rule on these objections because the Court did not rely on the challenged evidence.

### 7. Objections to the First Conrey Declaration

 Defendants object to Paragraph 1 of the first declaration made by Dr. Frederica Conrey ("Dr. Conrey") on the grounds of best evidence rule and mischaracterization of the evidence. (Docket Nos. 376, 424, 507.) Mischaracterization of evidence is not a cognizable evidentiary objection. Further, the best evidence objection has no merit as the survey referenced in the First Conrey Declaration is attached to said declaration. Accordingly, this objection is **OVERRULED.**

### B. *THE FTC'S EVIDENTIARY OBJECTIONS*

The FTC filed evidentiary objections to portions of the declarations filed by Defendants in support of their opposition to the motion for summary judgment. The FTC objects to the declarations made by the following: (1) Jason Han [38]; (2) Jeff Paul [39]; (3) John Alexander [40]; (4) Christopher Gravink [41]; (5) Jeff Devoll; (6) Darryl Fields; (7) Kelvin Bell; (8) Greg Whiting; (9) Stephens [42]; (10) Douglas Gravink [43]; Erica Brutocao–Kemp [44]; (12) Erica Stahura [45]; (13) Gary Hewitt [46]; (14) Michael O'Connell [47]; (15) Ana Alicia Pelaez [48]; (16) Laura Beck [49]; (17) John Beck [50]; (18) Eric Barry [51]; and (19) Tobey Wagonner.[52] To the extent that the Court relied on Defendants' proffered evidence, the objections are **OVERRULED.** The Court need not rule on FTC's objections to the extent that

38. Han Decl., docket no. 442; Pl.'s Evidentiary Objection to Han Decl., docket no. 482.

39. Paul Decl., docket no. 455; Pl.'s Evidentiary Objection to Paul Decl., docket no. 483.

40. Alexander Decl., docket no. 441; Pl.'s Evidentiary Objection to Alexander Decl., docket no. 441.

41. C. Gravink Decl., docket no. 444; Pl.'s Evidentiary Objection to C. Gravink Decl., docket no. 493.

42. Devoll Decl., docket no. 446; Fields Decl., docket no. 447; Bell Decl., docket no. 453; Whiting Decl., docket no. 457; Stephens Decl., docket no. 459; Pl.'s Evidentiary Objection to the Devoll Decl., Fields Decl, Bell Decl., Whiting Decl., and Stephens Decl., docket no. 494.

43. D. Gravink Decl., docket no. 448; Pl.'s Evidentiary Objection to D. Gravink Decl., docket no. 495.

44. Brutocao–Kemp Decl., docket no. 449; Pl.'s Evidentiary Objection to Brutocao–Kemp Decl., docket no. 496.

45. Stahura Decl., docket no. 450; Pl.'s Evidentiary Objection to Stahura Decl., docket no. 497.

46. Hewitt Decl., docket no. 451; Pl.'s Evidentiary Objection to Hewitt Decl., docket no. 498.

47. O'Connell Decl., docket no. 444; Pl.'s Evidentiary Objection to O'Connell Decl., docket no. 499.

48. Pelaez Decl., docket no. 500; Pl.'s Evidentiary Objection to Pelaez Decl., docket no. 500.

49. L. Beck Decl., docket no. 461; Pl.'s Evidentiary Objection to L. Beck Decl., docket no. 501.

50. J. Beck Decl. docket no. 443; Pl.'s Evidentiary Objection to J. Beck Decl., docket no. 512.

51. Barry Decl., docket no. 442; Pl.'s Evidentiary Objection to Barry Decl., docket no. 515.

52. Waggonner Decl., docket no. 458; Pl.'s Evidentiary Objection to Waggonner Decl., docket no. 518.

they pertain to matters that are not expressly cited in this order.

## C. *DEFENDANTS' MOTION IN LIMINE NO. 1*

While couched as a "motion in limine", this motion, docket no. 426, is essentially an evidentiary objection to the FTC's use of a survey conducted by Dr. Conrey, who was designated by the FTC as an expert.[53] Defendants also seek to preclude any testimony of Dr. Conrey regarding the survey and its findings.[54]

Dr. Conrey is a Survey Methodologist at ICF Macro, a firm retained by the FTC to conduct the telephone survey at issue.[55] The Conrey Survey "measured the earnings and profit experienced by consumers who had purchased one of the three products. [It] also investigated whether investment in coaching services or investment of time was related to consumers' earnings or profit." [56] The FTC provided ICF Macro with the list of people whose names appeared in customer databases of the three products. From these lists, ICF Macro pulled a sample of records to contact for telephone interviews. Each person in the sample was mailed a Prenotification Letter notifying them about the research study.[57] The Prenotification Letter read in pertinent part:

> **The Federal Trade Commission needs your help.** Since 1914, the Federal Trade Commission (the FTC) has protected American consumers by monitoring and regulating businesses. In order to fulfill this responsibility, it periodically conducts research into the experiences of customers who have purchased certain types of products and services. **As part of a current research study, the FTC has enlisted the help of ICF Macro, an independent research firm, to learn about customers' experiences with [PRODUCT NAME].** A few days from now, you will receive a phone call from an ICF Macro interviewer who will ask for your assistance in this important research effort. . . .

(Emphasis in the original.) [58] Between August and November 2010, ICF Macro conducted 5,990 telephone interviews. The questionnaire was developed by the FTC. Dr. Conrey reviewed the questionnaire, consulted with the FTC on revisions, and confirmed that the final product was consistent with best practices in survey design.[59]

Defendants move to exclude evidence relating to the Conrey Survey, including the First Conrey Declaration (docket no. 376), on the ground that the survey's Prenotification Letter, "poisoned the well in such a way as to invalidate whatever survey finding the FTC obtained." (Mot. in Limine 1.) Defendants contend that the entire structure of the Prenotification Letter, which positions the FTC as the "good guy" fighting "to protect" "American consumers", is deeply prejudicial and preconditions responders to respond favorably for the FTC. Further, Defendants challenge the manner in which Dr. Conrey conducted her survey, which renders the results unreliable.

---

53. Conrey 1st Decl., Attach. 1. (Docket No. 376.)

54. In support of the Motion in Limine, Defendants have submitted a Rebuttal Report prepared by their expert, Michael Kamins ("Dr. Kamins"). *See* Kamins Decl. ¶ 8, Ex. 2, Docket No. 426–3.

55. Conrey 1st Decl. ¶ 1.

56. Conrey 1st Decl. ¶ 1, Attach. 1 at 1.

57. Conrey 1st Decl., Attach. 1 at 1.

58. Conrey 1st Decl., Attach. 1 at 20.

59. Conrey 1st Decl., Attach. 1 at 5.

The admissibility of expert testimony is governed by FRE 702, which provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

 "The proponent of the survey bears the burden of establishing its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.1988). In the Ninth Circuit, a party seeking to admit survey evidence must show that the survey was "conducted according to accepted principles." *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1262 (9th Cir.2001); *see also*, *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1036 (9th Cir.2010) ("We have long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.' ") (alterations in the original). Criticisms related to "the format of the questions or the manner in which [the survey] was taken" go to the weight of the evidence, not its admissibility. *Fortune Dynamic*, 618 F.3d at 1036 (" '[T]echnical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.' "); *Wendt v. Host Int'l*, 125 F.3d 806, 814 (9th Cir.1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").

In *Keith*, the party challenging the admission of a survey had contested, *inter alia*, the objectivity of the survey. However, the survey director had testified that the methods used were "accepted social science techniques in accord with generally accepted standards in the field." *Keith*, 858 F.2d at 481. Based on this testimony, the Ninth Circuit held that district court did not err in admitting the survey.

In *Fortune Dynamic*, the trial court excluded a survey on various grounds including the fact that the survey may have been "highly suggestive." 618 F.3d at 1037. The Ninth Circuit reversed, holding that a survey should be admitted as long as it is based on accepted principles and is relevant. *Id.*

 Much like in *Keith* and *Fortune Dynamic*, here, Defendants challenge the admissibility of the survey and testimony relating to that survey on the ground that it lacked objectivity and was highly suggestive. In response, much like the expert in *Keith*, Dr. Conrey testified that the survey methods she used were in accord with generally accepted standards in the field.[60] Further, Dr. Conrey attested to the objectivity of her survey and has responded to the various shortcomings raised by Dr. Kamins.[61] In addition, with regard to the allegedly prejudicial Prenotification Letter, Dr. Conrey explained that there was no feasible alternative to such disclosure given the privacy and legitimacy concerns of the survey participants.[62] As Dr. Conrey noted, it was important to give respondents confidence that the sponsor of the survey was credible and legitimate to avoid any confusion or suspicion about who

---

**60.** Conrey 2nd Decl. ¶ 18, Docket No. 508.

**61.** Conrey 2nd Decl. ¶¶ 19–32.

**62.** Conrey 2nd Decl. ¶¶ 5–7.

**1066**

was sponsoring the survey.[63] The Court finds that the Conrey Survey was performed under accepted principles used by experts in the field and is therefore admissible under Rule 702. Accordingly, Defendants' motion to preclude the FTC from using the Conrey Survey or any expert testimony premised thereon is DENIED.[64]

## IV. DISCUSSION

### A. *SECTION 5 VIOLATIONS*

▮ Section 5 of the FTCA prohibits "unfair methods of competition in or affecting commerce[ ] and unfair or deceptive acts or practices in or affecting commerce...." 15 U.S.C. § 45(a)(1). An act is deceptive if (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994) (adopting standard in *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164–65 (1984)).

▮ An advertisement can make both express claims and implied claims. Express claims "are ones that directly state the representation at issue." *In re Thompson Med. Co., Inc.*, 1984 FTC LEXIS 6, *311 (1984), aff'd, *Thompson Med. Co. v. FTC*, 791 F.2d 189, 197 (D.C.Cir. 1986), cert. denied, *Thompson Med. Co. v. FTC*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Implied claims "are any claims that are not express. They

range from claims that would be virtually synonymous with an express claim through language that literally says one thing but strongly suggests another, to language which relatively few consumers would interpret as making a particular representation." *Id.* at *312. The law does not recognize any distinction between express and implied misleading claims. *FTC v. Figgie Int'l*, 994 F.2d 595, 604 (9th Cir. 1993) ("Figgie frequently argues that some of the representations that the Commission found false or misleading were implied, not express. This is a distinction without a difference. Figgie can point to nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole.").

▮ "Advertisements as a whole may be completely misleading although every sentence separately considered is literally true." *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188, 68 S.Ct. 591, 92 L.Ed. 628 (1948). In assessing whether a representation or practice is likely to mislead consumers, a court may consider the overall net impression conveyed by the representation. *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1200 (9th Cir.2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."); *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir.2009) ("Deception may be found based on the 'net impres-

---

63. Conrey 2nd Decl. ¶ 7.

64. On November 14, 2011, the FTC filed a Notice of Errata to the First Conrey Declaration. (Docket No. 568.) Attached to the Notice was the Third Conrey Declaration, which explained that there was a "minor reporting error" in the "Methodological Notes" section (Appendix D) of her expert report. (Docket No. 376, Attachment 1 at 40 [Appendix D at D–6].) Dr. Conrey submits that this reporting error does not affect the underlying survey data or any of her tables or conclusions. In response, Defendants filed an evidentiary objection to the Third Conrey Declaration. (Docket No. 570.) Because Dr. Conrey attests that the reporting error does not affect any of the data upon which FTC relies and the Third Conrey Declaration merely explains context upon which that error arose, the Court **OVERRULES** Defendants' objection.

sion' created by a representation."). Further, "[t]he failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts," *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir.1984), and the deception may not be sufficiently cured merely by the inclusion of disclaimers in small print. *Cyberspace.Com*, 453 F.3d at 1200.

In demonstrating that a representation is likely to mislead, the FTC must establish that (1) such representation was false or (2) the advertiser lacked a reasonable basis for its claims. *See In re Thompson*, 1984 FTC LEXIS 6, at \*379 (stating that to make a case that advertising is deceptive, the FTC has the burden of showing that the material claims communicated to reasonable consumers by the advertising are false in some manner); *FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 748 (N.D.Ill.1992) ("Apart from challenging the truthfulness of an advertiser's representations, the FTC may challenge the representation as unsubstantiated if the advertiser lacked a reasonable basis for its claims.").

"For an advertiser to have had a 'reasonable basis' for a representation, it must have had some recognizable substantiation for the representation prior to making it in an advertisement." *FTC v. Direct Mktg. Concepts, Inc.*, 569 F.Supp.2d 285, 298 (D.Mass.2008) (citations omitted). "Defendants have the burden of establishing what substantiation they relied on for their product claims." *FTC v. QT, Inc.*, 448 F.Supp.2d 908, 959 (N.D.Ill.2006). "The FTC has the burden of proving that Defendants' purported substantiation is inadequate...." *Id.* "In determining whether an advertiser has satisfied the reasonable basis requirement, the Commission or court must first determine what level of substantiation the advertiser is required to

have for his advertising claims. Then, the adjudicator must determine whether the advertiser possessed that level of substantiation." *Pantron I Corp.*, 33 F.3d at 1096.

A claim is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.Com*, 453 F.3d at 1201. A representation or practice is material if it "is likely to affect a consumer's choice of or conduct regarding a product or service." *In re Southwest Sunsites, Inc.*, 1980 FTC LEXIS 86, at \*328 (F.T.C.1980) (citing *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 387, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965)).

### 1. Deceptive Infomercial Claims—Claims 1, 3, and 5

#### a. Claim 1—Deceptive 2005 and 2007 Beck Infomercials

The FTC alleges that in connection with the John Beck system, Defendant Beck, the "guru" of the system, and Defendants JBAP, MOA, FP, Hewitt, and Gravink have expressly or implicitly represented that consumers who purchase and use the John Beck System are likely to be able to: (1) purchase homes, at government tax sales in their area, "free and clear" of all mortgages or liens, for just "pennies on the dollar"; (2) earn substantial amounts of money renting or selling homes they purchase at government tax sales; and (3) quickly and easily earn substantial amounts of money with little financial investment. (Compl. ¶ 89.) The FTC claims that these representations were material and were either false or unsubstantiated at the time they were made. Because John Alexander, LLC and Jeff Paul, LLC are part of a "common enterprise," the FTC also claims that these corporate entities should be held liable for their co-

defendants' actions. (Mot. 37.) [65] The Court finds that the Beck infomercials violated Section 5 as a matter of law.

As a preliminary matter, the Court rejects the FTC's suggestion that the Court is bound by Judge Cooper's findings in the preliminary injunction order.

■■■ Preliminary findings at injunction proceedings are not law of the case. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984) ("A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment"). Therefore, the Court cannot grant the FTC's motion merely because the Court has previously issued a preliminary injunction. The FTC must establish a negative net impression anew based on the more rigorous standards courts employ in summary judgment proceedings.

The Court finds that the FTC has met its burden in showing that it is entitled to summary judgment as to Claim 1 because Defendants have made material misrepresentations that are either false or unsubstantiated.[66]

The FTC has established that Defendants falsely represented that consumers could "purchase" homes and other real estates for "pennies on the dollar" [67]; "buy homes at tax sales in consumers' own area, regardless of where they live"; [68] make money "easily" and with "little financial investment required" [69]; and make money "free and clear of all mortgages." [70]

The falsity of these representations is confirmed by the kit materials. Specifically, the materials teach consumers how to purchase tax liens and certificates, but the purchaser of a tax lien or certificate does not walk out of the tax sale with a deed or the right to turn around and sell the property.[71] Instead, consumers have a right to collect delinquent taxes, and only in exceptional circumstances will the purchaser of a tax lien end up with title and the right to possess or sell the property.[72] Additionally, tax sales are held only once a year and bidding typically starts at a very high percentage of the current fair market value of the property.[73]

Further, Beck himself confirms the falsity of his infomercials' representations. Contrary to his express claims in the infomercials that he has bought "thousands" of properties by using his system, Beck

---

**65.** "Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Think Achievement Corp.*, 144 F.Supp.2d 993, 1011 (N.D.Ind.2000) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746–47 (2d Cir.1964)).

**66.** Stahl 1st Decl. ¶¶ 5–6, Attachs. 2, 3. (Docket No. 20.)

**67.** Stahl 1st Decl., ¶¶ 5–6; Attach. 2 at 139–70; Attach. 3 at 205; Attach. 5 at 248; Beck Dep. Tr. 171:1–172:11, July 13, 2011, docket no. 331; DVD of John Beck Infomercials.

**68.** Stahl 1st Decl. Attachs. 2–3.

**69.** Stahl 1st Decl. ¶ 7(g), Attach. 4 at 243–47; ¶ 7(r), Attach. 3 at 194; ¶ 7(m), Attach. 7 at 251–52.

**70.** Stahl 1st Decl. ¶ 6, Attach. 3 at 197–99; Attach. 4 at 243–47.

**71.** Stahl 2nd Decl. ¶ 30, Attach. 15 at 514, 676, 831–32, docket no. 6; Beck RFA nos. 26–27, docket no. 352.

**72.** Stahl 2nd Decl. ¶ 29–31, Attachs. 15 at 514, 674, 831; Attach. 16 at 1132–33; Beck RFA no. 28.

**73.** Stahl 2nd Decl. ¶¶ 31, 36, Attach. 15 at 516, 773.

admitted at his deposition that he purchased homes using his system "very infrequently." [74] Indeed, Beck has purchased only 10 homes at tax foreclosure sales.[75] Moreover, while Beck claims that his daughter, Kate Beck, purchased over 90 properties using his system,[76] Beck knows only 4 of his "students" who have been able to get title to homes like those featured in the infomercial, and in those instances, the students had to wait several years before acquiring full ownership and had to go to court to foreclose on the right to redemption.[77] Beck also admitted that there are elaborate and time-consuming steps that consumers need to take before purchasing properties at tax sales, including payment of penalties for late payment and other associated costs.[78]

The falsity of the infomercials' representations is also confirmed by dozens of consumer witnesses, who testified that it is difficult or impossible to find government tax sales in their area, and it is difficult or impossible to earn substantial money by purchasing homes or land using the John Beck System.[79] These consumers had to invest a significant amount of money if they were going to be able to use the system for a profit.[80]

The declarations of these consumers are corroborated by the Conrey Survey. According to the survey results, less than 2% of all consumers made any revenues whatsoever.[81] Additionally, less than 0.2% of all consumers who purchased the kit materials have made any profits using the system, and only 1.9% of those who purchased coaching materials made any revenues using the system.[82] Lastly, of the consumers who spent ten or more hours per week using the product, only 3.5% of them made any revenues.[83]

In addition to the falsity of Defendants' claims in the infomercials, at the time these infomercials were produced and

74. Beck Dep. Tr. 112:3–5.

75. *Compare* 2005 John Beck infomercial *with* Beck Dep. Tr. 113:3–6, 174:1–176:24.

76. J. Beck Decl. ¶ 36.

77. Beck Dep. Tr. 174:1–177:8.

78. Beck Dep. Tr. 113:7–120:16, 247:21–248:6; Stahl 2nd Decl. ¶ 36, Attach. 15 at 515–516.

79. *See e.g.*, Coonrod Decl. ¶¶ 12, 14–15, docket no. 369 (only about half of the states in the United States allow tax foreclosure sales of property deeds); Day Decl. ¶ 25, docket no. 369 (made less than $1,000 profit after selling eight properties using the John Beck System); Fatula Decl. ¶¶ 16–17, docket no. 369 (he realized that the John Beck System is not going to work for him no matter how hard he tried); Jensen Decl. ¶¶ 20, 22–23, 26, docket no. 369 (the results are not "quick and easy"); Kaminski Decl. ¶¶ 17–21, docket no. 369 (finding properties "was nothing like what I had been led to expect"); Morton Decl. ¶ 9, docket no. 369 ("during a year spent working with the program, I did not complete a single transaction"); Rowold Decl. ¶ 14, docket no. 369 (the sessions were not very helpful); Schomp Decl. ¶¶ 4, 14–15, docket no. 369 (she "had no success at all with this program"); Stansell Decl. ¶¶ 14, 19, docket no. 369 (she "had made no money using the John Beck System"); Contreras Decl., ¶¶ 92–94, docket no. 373 ("Despite my best efforts, I found that it was extremely difficult to make the program work and that I could not and I could not find properties for 'pennies on the dollar' anywhere in the United States that I wanted to purchase."); Badora Decl. ¶ 39, docket no. 14 ("I learned that ... not all of the properties offered for sale in California were 'free and clear'," like those advertised on the infomercial).

80. *See e.g.*, Coonrod Decl. ¶ 12, Fatula Decl. ¶ 12, Jensen Decl. ¶ 26, Contreras Decl. ¶¶ 92–94, Schomp Decl. ¶ 12, Stansell Decl. ¶ 10.

81. Conrey 1st Decl., Attach. 1 at 10. (Docket No. 376.)

82. Conrey 1st Decl., Attach. 1 at 8, 10.

83. Conrey 1st Decl., Attach. 1 at 11.

aired, Beck, FP, Gravink, Hewitt, and the consumer endorsers did not have any evidence or documentation to show that most purchasers of the John Beck System had made a profit using that system.[84]

First, Defendants argue that the representations made in the infomercials are not false. For example, the houses featured in its commercials did in fact sell for the displayed prices.[85] Further, the John Beck System does not solely encourage purchasing homes, but also raw land and house sites.[86] Likewise, Defendants argue that as claimed in the infomercials, tax sale properties are not difficult to find and Beck's strategies can be applied in all 50 states because even if the consumer does not live in a non-tax lien state, he or she can use the Internet to purchase properties in other states.

For purposes of this motion, the Court has reviewed the Beck infomercials. The Court agrees with Judge Cooper's conclusion in the preliminary injunction order that "[b]ased upon the statements and visual representations made in the infomercials, the overall net impression communicates to the viewer that a typical consumer can easily purchase high-valued properties for pennies on the dollar and therefore quickly earn tens of thousands of dollars, if not hundreds of thousands of dollars." (11/17/2009 Order at 11–12.) It is immaterial that the kit also encourages purchasing raw land and house sites, because the visual representations of the infomercials themselves focus heavily on large homes and vacation properties. Further, even if it were true that houses featured in its

commercials did in fact sell for the displayed price and consumers from non-tax lien state can buy properties in tax-lien states via the Internet, these facts are immaterial because an advertisement could be misleading or deceptive by virtue of the net impression it creates even though it also contains truthful disclosures. *Cyberspace.Com*, 453 F.3d at 1200. Here, the infomercials' net impression communicates to the viewer that nice homes, such as those prominently displayed in these advertisements, are easily available in all 50 states with or without the use of the Internet and one can a obtain a deed to these properties easily for pennies on the dollar. What the John Beck infomercials fail to disclose is that in most states, a government tax foreclosure sale transfers a tax lien instead of a tax deed. A tax lien permits the purchaser to collect the delinquent taxes owed on the property, but does not transfer title to the property. In the remaining states where tax deeds are sold, an auction process makes it very difficult to purchase high-value properties for "pennies on the dollar." (11/17/2009 Order at 12.)

 Next, Defendants argue that the phrase "quick and easy" is never spoken and never appears in either of the John Beck commercials.[87] On the contrary, the words "quick" and "easy" or similar concepts are used repeatedly in the infomercials, and the net impression viewers get—that they can quickly and easily acquire a property for pennies on the dollar—is false.[88]

---

**84.** Beck RFA nos. 69–71, 75, 77, docket no. 352; FP RFA no. 70, docket no. 355; Gravink RFA no. 58, 70–71, docket no. 356; Hewitt RFA nos. 58, 70–71, docket no. 357.

**85.** Hewitt Decl., Ex. 2. (Docket No. 451.)

**86.** Kamins Decl., Ex. 1 at 20–21, Table 11. (Docket No. 426.)

**87.** DVD of John Beck infomercials.

**88.** Defendants offered the results of a copy test. (Kamins Decl.) However, that test fails to show a triable issue of material fact. In the event that a valid copy test is proffered, evidence showing that 10.5% to 17.3% of copy-test respondents took away the message

The Court finds that the misrepresentations in the John Beck infomercials are material, and no reasonable trier of fact could conclude that the misrepresentations were not likely to mislead consumers acting reasonably under the circumstances. Accordingly, summary adjudication of Claim 1 is **GRANTED.**

### b. Claim 3—Deceptive John Alexander Infomercial

■ The FTC alleges that in connection with the John Alexander System infomercials, Defendants Alexander, FP, MOA, Hewitt and Gravink violated Section 5 by making numerous material misrepresentations. (Compl.¶ 95.) Further, because John Alexander, LLC, Jeff Paul, LLC, and JBAP are part of a "common enterprise," the FTC claims that these corporate entities should also be held liable for their co-defendants' actions.[89] The Court concludes that the infomercial at issue violated Section 5 as a matter of law.

The FTC has submitted evidence showing that Defendants represented that consumers would be able to earn substantial amounts of money quickly using the John Alexander system.[90] Among other things, the FTC has lodged a copy of the infomercial.[91] The FTC has also submitted corroborating evidence showing that Defendants represented that consumers would make money easily and that they would be able to earn money without using any of their own money or credit.[92]

Defendants' representations were false. While the John Alexander materials contained disclosures, such as "[t]o become successful, time, persistence, knowledge, capitalization, and common sense are necessary,"[93] consumers could not make the system work even though they spent their own money, and devoted considerable time and effort.[94] Furthermore, the materials were confusing, and it was difficult or impossible to arrange financing for the buyers.[95] Defendants concede that during the time period in which the John Alexander infomercial was aired, Defendants did not have any evidence showing that most purchasers of the John Alexander System had

at issue is sufficient to prove the complaint allegation that the challenged representation had been made. *See In re Telebrands Corp.,* 140 F.T.C. 278, 325 (F.T.C.2005) ("Regardless of the reduction in the difference between the test group and control group responses, the ALJ held correctly that as a matter of law the net takeaway—which ranged from 10.5% to 17.3% for all claims except the fat deposit claim—was sufficient to conclude that the challenged claims were communicated."). As explained in the FTC's reply brief, the number of respondents who reported the challenged claims were communicated to them exceeds 10.5%. Accordingly, the copy test supports FTC's conclusion.

89. Stahl 6th Decl., Attach. 4, DVD of John Alexander infomercial. (Docket No. 521.)

90. Stahl 5th Decl. ¶ 5, Attach. 2 at 99:9–12, docket no. 367; Hrdlichka Decl. ¶ 4 docket no. 370.

91. Stahl 6th Decl., Attach. 4.

92. Hrdlichka Decl. ¶ 3; Jabbour Decl. ¶ 2, docket no. 370; Pinkney Decl. ¶ 2, docket no. 370; Selitto ¶ 2, docket no. 370; Smyth Decl. ¶ 2, docket no. 370.

93. Stahl 6th Decl., Attach. 7 at 158.

94. Stahl MSJ Decl. ¶ 15, Attach. 7 at 158; Grubbs Decl. ¶ 10, docket no. 370; Selitto Decl. ¶¶ 8–9; Sohnly Decl. ¶¶ 8–10 docket no. 370; Stroughter Decl. ¶ 5, docket no. 370; Dohrn Decl. ¶ 9, docket no. 370; Hrdlichka Decl. ¶ 7; Selitto Decl. ¶ 8; Sohnly Decl. ¶ 4; Stroughter Decl. ¶ 6; Torres Decl. ¶ 12.

95. Dohrn Decl. ¶ 9; Hrdlichka Decl. ¶ 7; Selitto Decl. ¶ 8; Sohnly Decl. ¶ 4.

made a profit using the system.[96]

Further, the Conrey Survey reveals that the representations in the infomercial are unsubstantiated. The survey shows that consumers were unable to make any money using the John Alexander system. Specifically, less than one percent (0.8% of all consumers who purchased the John Alexander kit) made any revenues whatsoever and less than one percent of all consumers who purchased the kit materials have made any profit using the system.[97] Of those who spent ten or more hours per week using the product, only 2.5% of consumers made any revenues.[98]

Defendants counter that the representations made in the infomercial were true and there were satisfied customers.[99] Defendants also claim that the testimonials of the endorsers were disclaimed in the infomercial with the inclusion of this statement: "Unique experience. Individual results may vary." [100] Moreover, Defendants argue that the commercial is clear that money can be made only by following the system, which indicates, at a minimum, that consumers have to educate themselves with the materials, and the words "quickly and easily" never appear in the commercial. (Opp'n 16–17.) Lastly, Defendants dispute the results of the Conrey Survey.

As stated previously, representations made in advertisements may be deceptive even if it also contains truthful disclosures. *See Donaldson,* 333 U.S. at 188, 68 S.Ct. 591 ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed ... in such way as to mislead."). Accordingly, even *if* Defendants' claim—that there were satisfied customers who used Alexander's product and strategies—were true, this alone does not shield Defendants from Section 5 liability. Likewise, the small print disclaimers in the Alexander infomercial do not preclude liability. The prints are so tiny that, under the circumstances, consumers are unlikely to read them while watching and listening to the testimonials of the endorsers.

Having viewed the infomercial and considered all admissible evidence, the Court finds that the infomercials' net impression—that a typical consumer can earn fast cash with no financial investment by purchasing and using the John Alexander system—is false. Defendants also lack a reasonable basis to assert that such a claim is true.

The Court finds that the misrepresentations in the John Alexander infomercial are material, and no reasonable trier of fact could conclude that the misrepresentations were not likely to mislead consumers acting reasonably under the circumstances. Accordingly, summary adjudication of Claim 3 is **GRANTED.**

### c. Claim 5—Deceptive Jeff Paul Infomercials

### 2. Deceptive Continuity Programs Claims—Claims 2, 4, and 6

The two Jeff Paul infomercials at issue are "Jeff Paul's Shortcuts to Internet Millions." Each infomercial includes nu-

---

**96.** Alexander LLC RFA no. 37–38, docket no. 358; Alexander RFA no. 36–37, docket no. 351; FP RFA nos. 202–203.

**97.** Conrey Decl., Attach. 1 at 9–11.

**98.** Conrey Decl., Attach. 1 at 10.

**99.** Devoll Decl. ¶¶ 4–9, 11, Ex. E, docket no. 446; Alexander Decl., Ex. 1.

**100.** DVD of John Alexander infomercial.

merous testimonials from people who purportedly used the Jeff Paul System, along with screen shots showing how much money the endorsers made. Each infomercial includes numerous references to how fast and easy it is to make money using the Jeff Paul System front-end kits.[101] The FTC contends that the infomercials' references to making large sums of money quickly and easily and the use of the term "millions" in the name "Shortcuts to Internet Millions" were intended to convey the message that the product was about making lots of money. The FTC further argues that these representations were material to consumers. Having reviewed the admissible evidence, including the two infomercials, the Court agrees with Judge Cooper's conclusion that the infomercials' overall net impression falsely communicates to the viewer that a typical consumer can easily and quickly earn thousands of dollars per week simply by purchasing and using the Jeff Paul System. (11/17/2009 Order at 16.) Paul himself admitted that his system does not teach consumers to make substantial amount of money easily.[102] Further, while Paul claims in the infomercials that he has changed the lives of "countless people," he did not have the slightest inkling of how many people's lives were changed by using his products and methods.[103]

The falsity of the representations made in the infomercials is confirmed by the kit materials. For example, while it is techni-cally possible for a consumer to create and use the free websites described in the infomercials, each "website" is a single, unattractive webpage with a basic white background and boilerplate text. (11/17/2009 Order at 16–17.)[104] According to the Jeff Paul materials, consumers must start their own businesses from scratch by creating and marketing their own products.[105]

Further, the falsity of the infomercials is confirmed by testimony from consumer witnesses who purchased the Jeff Paul materials. Consumers attest that they were unable to earn any money using the Jeff Paul System.[106] Consumers also found that the kit materials provided little or no instruction on how to make money using the Internet.[107]

Moreover, the falsity of the representations is also confirmed by the Conrey Survey, which states that less than one percent (0.7%) of all consumers who purchased the Jeff Paul kit materials made any revenues.[108] Less than one-half of one percent (0.4%) of all Jeff Paul customers have made any profit (revenues less expenses) using the Jeff Paul System.[109] The purchase of MOA's coaching services did little to enhance consumers' success. Only 1.4% of consumers who purchased coaching services made any revenues whatsoever using the system.[110] Of those consumers who spent ten or more hours per week using the product,

---

101. DVD of Jeff Paul infomercials.

102. Paul Dep. Tr. 97:4–98:19. (Docket No. 556.)

103. Paul Dep. Tr. 104:7–106:13.

104. *See also,* Gale Decl. ¶ 28. (Docket No. 19.)

105. Brennan Decl., Attach. 1 at 77–79. (Docket No. 14.)

106. *See e.g.,* Collins Decl. ¶ 21; King Decl. ¶ 9; Ryan Decl. ¶ 24. (Docket Nos. 16 at Exs. 23, 26, 28.)

107. *See e.g.,* Griffith Decl., ¶ 13; Scheck Decl. ¶ 4. (Docket No. 16 at Exs. 24, 29.)

108. Conrey 1st Decl., Attach. 1 at 12.

109. Conrey 1st Decl., Attach. 1 at 12.

110. Conrey 1st Decl., Attach. 1 at 13.

only 2.4% of consumers made any revenues whatsoever using the system.[111]

The FTC has also established that during the time these infomercials were aired, Defendants did not have evidence or documentation to substantiate their representations. Indeed, Defendants concede that during the time period in which the 2007 Jeff Paul infomercial was aired, they did not have any evidence to show that there were more than 5 people who made $50,000 or more using the Jeff Paul System.[112]

Defendants counter that the front-end materials make it clear that it is up to the individual to go out and market the products and to do the things outlined in the detailed step-by-step program. (Opp'n 18.) This argument is unavailing because the infomercials do not disclose these additional steps. Instead, these infomercials gave the overall impression that a typical consumer can easily, quickly, and "magically" earn thousands of dollars per week simply by purchasing and using the Jeff Paul System.[113] The Court finds that the misrepresentations are material, and no reasonable trier of fact could conclude that the misrepresentations were not likely to mislead consumers acting reasonably under the circumstances. Accordingly, summary adjudication of Claim 5 is **GRANTED.**

 In connection with each wealth-creation products, Defendants represented that consumers who purchase these products will receive a free 30–day membership to the "John Beck Property Vault" (Claim 2), "John's Club" (Claim 4), and "Jeff Paul's Big League" (Claim 6), respectively. The FTC alleges that Defendants failed to

disclose, or failed to disclose adequately, that after the trial period ends, consumers who purchase these systems are still enrolled in a continuity membership plan that costs $39.95 per month, and the consumers are charged $39.95 each month unless consumers take affirmative action to cancel their memberships.

The evidence relied upon by the FTC in support of Claims 2, 4, and 6 is the same evidence it cited in support of the TSR claims, Claims 8, 10, and 12. As such, the FTC conflates its analysis of these six claims. (Mot. 42, Reply 26.) As explained more thoroughly below, information that purchasers would be automatically enrolled in continuity programs upon their purchase of the front-end kits is material, and Defendants' failure to disclose this information to consumers is likely to mislead the consumers acting reasonably under the circumstances. Accordingly, summary judgment is **GRANTED** on Claims 2, 4, and 6.

### 3. Deceptive Coaching Claims— Claim 7

 The FTC alleges that in connection with the coaching programs, Defendants have expressly or implicitly represented that consumers who purchase and complete the coaching program will quickly earn back the cost or substantially more than the cost of the coaching program. (Compl. ¶ 107.) The FTC argues that Defendants' representations are likely to mislead because such representations were *both* false and unsubstantiated. (Mot. 10–13.) The Court agrees.

For example, FTC has submitted evidence showing that through their tele-

---

111. Conrey Decl., Attach. 1 at 12.

112. Paul nos. 35, 40, docket no. 355; Jeff Paul LLC RFA nos. 47–50, docket no. 360;

FP RFA no. 142; Gravink RFA no. 142; Hewitt RFA no. 142.

113. DVD of Jeff Paul infomercials.

marketers, Defendants falsely represented that consumers would quickly and easily earn back the cost of coaching and the coaching substantially enhances consumers' chances of making money.[114] Moreover, the evidence shows that the telemarketers often made express earnings claims [115] and guaranteed that the consumers will make money.[116] The telemarketers represented to consumers that Defendants' personal coaches will ensure consumers' success by holding their hands and walking them "step by step" through the systems.[117] Some telemarketers even suggested that absent coaching, failure is guaranteed.[118] These representations are false and unsubstantiated.

The Conrey Survey shows that almost all who purchased coaching programs lost money, and more than 17 percent lost at least $10,000.[119] Only 1.7% of consumers who purchased coaching services made any profit whatsoever.[120] Further, the evidence showing that the coaches failed to answer their questions and did not walk

them step-by-step as promised by the telemarketers.[121]

Defendants counter that the FTC failed to take into account FP's generous refund policies; its recording program; its Quality Assurance ("QA") program; and its fining policies.[122] Defendants also note that they "undertook costly and extensive efforts to reign in rogue staff and to keep their sales legally compliant." [123] Defendants also argue that disputes exist as to the extent of the allegedly improper conduct and whether such conduct was confined to one call center, American Fork, which closed years ago. (Opp'n 22.) Defendants also claim that ample evidence shows that that these mentoring services developed students' valuable Internet marketing and real estate investing skills.[124]

Defendants' argument misses the mark. Viewing the facts in the light most favorable to the Defendants, they have failed to controvert the fact that their telemarketers made false and unsubstantiated misrepresentations. Regardless of the exis-

114. Coonrod Decl. ¶ 8 (Beck System); Kaminski Decl. ¶ 12 (Beck System); Schomp Decl. ¶¶ 7, 9 (Beck System); Selitto Decl. ¶¶ 5–6, Attach. 1 (Alexander System); Grubbs ¶ 4 (Alexander System); Stahl 2nd Decl. ¶ 58 b, Attach. 22, Chart 2 (Paul System).

115. Fox Decl. ¶ 6 (salespeople were allowed to say that some consumers earned a lot of money using the coaching programs); Fatula Decl. ¶¶ 5, 8 (earnings claims in Beck System); Dohrn Decl. ¶ 5 (earnings claims in Alexander System); Grubbs Decl. ¶ 4 (earnings claims in Alexander System).

116. Contreras Decl. ¶¶ 34, 36; Lawson Decl. ¶ 37; Coonrod Decl. ¶ 8; Kaminski Decl. ¶ 12; Schomp Decl. ¶¶ 7, 9; McClellan Decl. ¶ 7; Grubbs Decl. ¶ 4; Jabbour Decl. ¶ 3; Stroughter Decl. ¶ 4; Torres Decl. ¶ 4.

117. Stahl 1st Decl. ¶ 17; Coonrod Decl. ¶ 6; Kaminski Decl. ¶ 6; Mendoza Decl. ¶ 6; Rowold Decl. ¶ 7.

118. Fatula Decl. ¶ 5; Coonrod Decl. ¶ 6; Kaminski Decl. ¶ 6.

119. Conrey Decl., Attach. 1 at 5.

120. Conrey Decl., Attach. 1 at 5.

121. See e.g., Fatula ¶ 14; Kaminski, ¶¶ 17–18.

122. Opp'n 22; Gravink Dep. Tr. 58:17–59:15, docket no. 558 (fining policy); O'Connell MSJ Decl. ¶ 12, docket no. 454 (formal training of telemarketers); D. Gravink Decl. ¶¶ 10–12 (QA policy, sophisticated recording system, and fining reports), docket no. 448.

123. See Hewitt Decl. ¶ 10; ¶¶ 23–26 (MOA fining policy); ¶ 28 (sophisticated recording system), docket no. 451. See also, O'Connell MSJ Decl. ¶ 12 (formal training program of telemarketers at MOA, American Fork).

124. Hewitt Decl., Exs. 10, 15, 17–19 (emails from consumers providing positive reviews).

tence of Defendants' policies and approved scripts, Defendants failed to point to any evidence showing that misleading representations were *not* made. Further, despite its "sophisticated recording program," there is no evidence showing that recording of telemarketing transactions has reduced or eliminated the false claims. Moreover, it is undisputed that the claim that consumers could quickly and easily earn back the money they spent on these coaching programs are unsubstantiated. In addition to the findings of the Conrey Survey, the FTC has submitted evidence that shows that Defendants did not know if most of the purchasers of the coaching programs made a profit after using their programs, despite Beck, Paul, and Alexander's claims that it is easy to make money using their system.[125]

Further, the Court finds that Defendants' representations in connection with the coaching programs were material. All express representations are material, and implied representations are material "when they pertain to the central characteristics of the products or services being marketed." *In re Southwest Sunsites,* 1980 FTC LEXIS 86, at *329. Defendants have made both express and implied false representations, and no reasonable finder of fact would conclude otherwise.

Accordingly, summary adjudication of Claim 7 is **GRANTED.**

### B. *TSR VIOLATIONS*

**1. Claims 8, 10, and 12—Failure to Disclose Clearly and Conspicuously Enrollment in a Continuity Plan**

The FTC alleges that the continuity charges imposed in the systems violate section 310.3(a)(1)(vii) of the TSR. The

continuity charges are monthly recurring charges to the purchasers after the 30-day trial period ended unless the purchasers take affirmative steps to cancel the charges.

Section 310.3(a)(1)(vii) provides:

It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) *Before a customer consents to pay for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:* ...

(vii) If the offer includes a negative option feature, *all material terms and conditions of the negative option feature,* including, but not limited to, *the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s),* the date(s) the charge(s) will be submitted for payment, and the *specific steps the customer must take to avoid the charge(s).*

16 C.F.R. § 310.3(a)(1)(vii) (emphasis added).

 Here, there is no reasonable dispute that Defendants failed to adequately disclose to purchasers of the three systems that they would be automatically enrolled in continuity programs. The FTC's evidence shows that, following the placement of the order for the front-end kits, consumers were automatically charged $39.95 per month after the 30-day free trial period expired, and they had to contact Defendants to avoid future charges.[126]

125. Gravink RFA no. 142; FP RFA no. 142; MOA RFA no. 83; JBAP RFA no. 80.

126. Stahl 2nd Decl. ¶¶ 21–24, Attachs. 13 (Beck Interactive Agent Script) and 14 (Paul

In numerous instances, consumers were unaware they had been enrolled in the continuity plans until they noticed the $39.95 charges on their credit card statements.[127]

As the Court previously found in its preliminary injunction order, by enrolling consumers in the continuity service programs and obtaining consumers' payment information without first disclosing all material terms of the negative option, Defendants have violated the TSR. (11/17/2009 Order at 20–21.)

Defendants cite to the transcripts of the initial voice recording (IVR) for the three systems to support their argument that sufficient disclosures were made in accordance with § 310.3(a)(1)(vii).[128] (Opp'n 38.) Defendants explain that at the time of the purchase, the customers were informed that only the first month of membership will be free.[129] Further, the invoice and package disclosures shipped with the product provide the same disclosures. Customers also receive post card disclosures, telephonic expiration notice disclosures, and coaching disclosures. (Opp'n 20–21.)

The critical issue is *when* disclosures must be made. (Reply 27; 11/28/2011 Hearing Tr. at 6:16.) Section 310.3(a)(1)(vii) requires that disclosures be made *before* the consumer divulges his credit-card or bank account information.[130] Therefore, any disclosures made after the initial call are inadequate. Defendants have not directed the Court to any evidence showing that they complied with the mandate of section 310.3(a)(1) by making disclosures *before* the consumers divulged their credit card account information. The Court has reviewed the transcripts of the IVR and concludes that no reasonable trier of fact would conclude that Defendants complied with the TSR. The transcripts show that, before consumers were asked for their credit card information, they

Interactive Agent Script); Stahl 6th Decl. ¶¶ 11–12, Attach. 5, docket no. 540 (Alexander Interactive Agent Script).

127. Coonrod Decl. ¶ 3 (John Beck System); Day Decl. ¶ 20(John Beck System); Gorzen Decl. ¶ 3, docket no. 369 (John Beck System); Hudson Decl. ¶ 4, docket no. 369 (John Beck System); Kaminski Decl. ¶ 5 (John Beck System); Fernandez Decl. ¶ 3, docket no. 370 (John Alexander System); Humber Decl. ¶ 4, docket no. 370 (John Alexander System); Kemper Decl. ¶ 3, docket no. 370 (John Alexander System); Mahlum Decl. ¶ 5, docket no. 370 (John Alexander System); Smyth Decl. ¶ 8, docket no. 370 (John Alexander System); Somers Decl. ¶ 4, docket no. 370 (John Alexander System).

128. Hewitt Decl. ¶ 40, Ex. 6. (Docket No. 451-7.)

129. Gabor Supplemental Decl. ¶ 6. (Docket No. 583.)

130. The Court's reading of section 310.3(a)(1) is consistent with the legislative history of this rule. In the "Statement of Basis and Purpose" for the original rule, the FTC "noted that for a telemarketer to make the required disclosures 'before a customer pays,' *the disclosures must be made 'before the consumer sends funds to a seller or telemarketer or divulges to a telemarketer or seller credit card or bank account information.'* " 68 F.R. 4580, 4599 (2003) (emphasis added) (citation omitted). In the original rule's TSR Compliance Guide, the FTC further clarified that the disclosures required by § 310.3(a)(1) must be made "[b]efore a seller or telemarketer obtains a consumer's consent to purchase, or persuades a consumer to send any full or partial payment...." 68 F.R. at 4599. The Guide goes on to say that "[a] seller or telemarketer also must provide the required information before requesting any credit card, bank account, or other information that a seller or telemarketer will or could use to obtain payment." 68 F.R. at 4599. In amending section 310.3(a)(1) in 2003, the FTC expressed that "its statements to date on the meaning of the term 'before the customer pay' in the original rule are sufficiently clear," and modification is unnecessary. 68 F.R. at 4599.

heard the "Greeting" portion of the script, and if they were ready to order, they were immediately asked for their payment information. (Hewitt Decl., Ex. 6 at 000681, 000704, 000732.) Prior to divulging their credit card information, consumers were not told that (1) their account would be charged unless they take an affirmative action to avoid the charge(s); (2) the date(s) the charge(s) will be submitted for payment; and (3) the specific steps the consumer must take to avoid the charge(s). 16 C.F.R. § 310.3(a)(1)(vii). Further, the recording only states that the consumers would get a 30-day free trial membership to Defendants' "clubs," but it fails to clearly and conspicuously disclose that the consumers would need to take affirmative action at the end of the free trial to avoid being charged.

For these reasons, summary adjudication of Claims 8, 10, and 12 is **GRANTED.**[131]

### 2. Claims 9, 11, and 13—Submission of Consumer Payment Information Without the Consumer's Express Consent

■■■ The FTC alleges in Claims 9, 11, and 13 that Defendants violated Section 310.4(a)(6) of the TSR by representing that consumers who purchased one of the systems would receive a free 30-day membership to a special service, and then causing consumers' billing information to be submitted for payment without the express informed consent of the consumer after the trial period ended.[132]

Here, there is no reasonable dispute that Defendants automatically charged consumers $39.95 per month after a 30-day free trial period without the expressed informed consent of the consumers.[133] Although Defendants counter that the infomercials and other materials make it clear that only the first 30 days are free (Opp'n 20), as previously discussed, any disclosures made after the initial call are irrelevant. Accordingly, summary adjudication of Claims 9, 11, and 13 is **GRANTED.**[134]

### 3. Claim 14—Do Not Call Violations

■■■ The FTC alleges that Defendants violated section 310.4(b)(1)(iii)(A) of the TSR. Section 310.4(b)(1)(iii)(A) prohibits "a telemarketer to . . . [initiate] any outbound telephone call to a person when . . . that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered."

---

**131.** Claims 8, 10, and 12 only affect Family Products, Hewitt, Gravink, and other corporate defendants. (Mot. 43.)

**132.** The parties erroneously cite to section 310.4(a)(6), but section 310.4(a)(7) is the more appropriate rule. As amended, section 310.4(a)(6) prohibits any seller or telemarketer to "disclos[e] or receiv[e], for consideration, unencrypted consumer account numbers for use in telemarketing. . . ." 16 C.F.R. § 310.4(a)(6). On the other hand, section 310.4(a)(7) prohibits any seller or telemarketer to "caus[e] billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer. . . . In any telemarketing transaction, the seller or telemarketer must obtain

the express informed consent of the customer . . . to be charged for the goods or services. . . ." 16 C.F.R. § 310.4(a)(7). Therefore, the Court finds that section 310.4(a)(7) fits squarely with the facts of this case.

**133.** *See e.g.,* Coonrod Decl. ¶ 3 (Beck System); Day Decl. ¶ 20 (Beck System); Fernandez Decl. ¶ 4 (Alexander System); Humber Decl. ¶ 4 (Alexander System); Kemper Decl. ¶ 3 (Alexander System); Stahl 2nd Decl., Attach 14 at 484 (Paul System); Collins Decl., ¶ 9 (Jeff Paul System).

**134.** Claims 9, 11, and 13 only affect FP, Hewitt, Gravink, and other corporate defendants. (Mot. 43–44.)

Here, there is no reasonable dispute that Defendants' telemarketers repeatedly initiated calls to consumers who previously asked Defendants not to contact them.[135] The FTC has submitted overwhelming evidence showing that Defendants failed to set up a meaningful compliance program; lack written procedures; and do not appear to train their staff in a meaningful way.[136] Moreover, the evidence shows that Defendants allowed paper leads to pile up on boiler room floors before marking them as "do not call" requests in their lead generation database.[137] Defendants' telemarketers also engaged in "lead recycling," which ensures that consumers, including those who have asked to receive no further calls, will be called multiple times.[138]

Defendants argue that the violations were isolated incidents that should not be the basis for liability under § 310.4(b)(1)(iii)(A). (Opp'n 40.) Further, Defendants claim that the FTC has failed to show that these violations fell outside the 30-day grace period that Defendants had to place those customers on the company's internal "do not call" list.[139]

However, there is no dispute that Defendants have no written policies and procedures with regard to handling "do not call" complaints. Indeed, the Chief Operating Officer of MOA, Michael O'Connell, admits that MOA had no written policy with regard to the TSR's "do not call" provision.[140] Moreover, the safe harbor provision that Defendants cite has no application to this case. That provision provides that a seller or telemarketer will not be liable for violating § 310.4(b)(1)(iii)(A) if it can show that "as part of the seller's or telemarketer's routine business practice . . . (iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the 'do-not-call' registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process. . . ." 16 C.F.R. § 310.4(b)(3)(iv). Here, Defendants point to no evidence of any concrete policies and procedures that relate to the maintenance of any registry. For all these reasons, summary adjudication of Claim 14 is **GRANTED**.

## C. *REMEDIES*

The FTC asks for both injunctive and monetary relief of over $300 million dollars. (Mot. 1.)

### 1. Injunctive Relief

The FTC may seek a permanent injunction "in proper cases." 15 U.S.C. § 53(b)(1), (2). A routine deception case such as the case at bar qualifies as a "proper case." *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1111 (9th Cir.1982) (holding that § 13(b) of the FTCA authorizes courts to grant permanent injunctions "in proper cases" and "a routine fraud case is

135. Contreras Decl. ¶ 84; Hinckson Decl. ¶ 22 at 43–44, docket no. 373; Hudson Decl. ¶ 5; B. Petrarca Decl. ¶ 13; L. Petrarca Decl. ¶ 13.

136. O'Connell Dep. Tr. 95:21–96:5, 222:4–17, 223:7–16; 225:18–23, docket no. 555; Lawson Decl. ¶¶ 53, 55–56; Hinckson Decl. ¶ 22; Contreras Decl. ¶ 89.

137. Lawson Decl. ¶ 55; Contreras Decl. ¶ 87.

138. Hinckson Decl. ¶ 22; Lawson Decl. ¶¶ 55, 57; O'Connell Dep. 225:18–228:4; Contreras Decl. ¶ 90.

139. O'Connell Dep. Tr. 135:21–136:8, 213:3–214:16; 215:9–13, 217, 221:8–10; Johnson Dep. Tr. 2–13.

140. O'Connell Dep. Tr. 213–217.

a 'proper case' "); *FTC v. Gill,* 71 F.Supp.2d 1030, 1049 (C.D.Cal.1999) (finding that a case based on a § 5 violation is a "proper case" for purposes of injunctive relief under the FTCA).

 Upon finding that a business or an individual has engaged in deceptive conduct in violation of the FTCA, the court may issue a permanent injunction under Section 13(b). *Gill,* 71 F.Supp.2d at 1046. Individuals may be held liable for injunctive relief not only for their own deceptive conduct, but also in certain circumstances, for a corporation's deceptive conduct. "An officer of a corporation may be held individually liable for injunctive relief under the FTCA for corporate practices if the FTC can prove (1) that the corporation committed misrepresentations or omissions of a kind usually relied on by a reasonably prudent person, resulting in consumer injury, and (2) that the individual defendants participated directly in the acts or practices or had authority to control them." *FTC v. American Standard Credit Sys.,* 874 F.Supp. 1080, 1087 (C.D.Cal.1994) (citing *FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 573 (7th Cir. 1989), cert. denied, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989); *FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1292 (D.Minn.1985)).

 Here, the FTC seeks injunctive relief against Hewitt, Gravink, and the companies they control. (Reply 7–8, 27–28.) Status as a corporate officer is sufficient to establish individual liability. *Amy Travel Service,* 875 F.2d at 573 ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."); *FTC v. Nat'l Urological Group, Inc.,* 645 F.Supp.2d 1167, 1207 (N.D.Ga.2008) ("If a defendant was a corporate officer of a small, closely-held corporation, that individual's status gives rise to a presumption of ability to control the corporation."). Because the Court finds that liability has been established, and it is undisputed that Hewitt and Gravink own and control FP, which, in turn, is the sole member of MOA, JBAP, LLC, Jeff Paul, LLC d/b/a Shortcuts to Internet Millions, LLC, and John Alexander, LLC, Hewitt and Gravink are liable for injunctive relief.[141]

 The FTC also seeks to enjoin Beck, Alexander, and Paul. (Reply 14, 18–19, 21–22, respectively.) In FTC cases, individual defendants are directly liable for their own violations of Section 5. *FTC v. Windward Mktg.,* 1997 WL 33642380, at *13, 1997 U.S. Dist. LEXIS 17114, at *38 (N.D.Ga. Sept. 30, 1997). Further, they are also liable for the corporate defendant's violations if the FTC demonstrates that: (1) the corporate defendant violated the FTCA; (2) *the individual defendants participated directly in the wrongful acts or practices;* and (3) the individual defendants had some knowledge of the wrongful acts or practices. *Id.* (emphasis added) (citing *FTC v. GEM Merchandising Corp.,* 87 F.3d 466, 470 (11th Cir.1996)).

 Here, Beck, Alexander, and Paul are personally liable for the false and unsubstantiated claims they made in their respective infomercials. Unlike a paid spokesperson, there is no dispute that Beck, Paul, and Alexander were the developers of the systems that bear their names and gave the impression in the infomercials that they were experts in using the system.[142] Beck himself admits that he is the "primary author of the John Beck kit

141. Hewitt Decl., ¶¶ 2–5, docket no. 451; D. Gravink Decl. ¶ 2–3.

142. Alexander Decl. ¶ 1; Beck Decl. ¶ 1; Paul Decl. ¶ 1.

material sold by Defendants."[143] Likewise, Paul admits that he is the "co-creator" of the Jeff Paul kit.[144] Alexander also played a key role in the creation of the John Alexander kit.[145] Therefore, these "gurus" knew that their claims in the infomercials regarding how easy it is to make money using their system are false and unsubstantiated.

Because the record is clear that these "gurus" participated directly in the advertising of the deceptive produces, knew that the infomercials made material misrepresentations regarding the products, or at least were recklessly indifferent to the truth or falsity of the infomercials, the Court finds that they are liable for injunctive relief with respect to the system they developed. *Nat'l Urological Group,* 645 F.Supp.2d at 1207–1208 (holding a medical doctor who promoted and endorsed the deceptive products individually liable because he helped develop the products; reviewed the substantiation regarding the ingredients in the products; reviewed and edited the advertisements before they were disseminated; allowed himself to be called "Chief of Staff" and "Medical Director" in the advertisements; and did not contest his individual liability for the corporate defendants' wrongs; instead, he simply joins the corporate defendants in arguing that no violations occurred).

With regard to the scope of the injunction, the FTC submits that the type of injunctive relief it seeks includes standard provisions obtained in other FTC cases. (Reply 44.)[146] Among other things, the FTC asks that Gravink, Hewitt, and FP—whether acting directly or through any other person or entity, and each such person—be "permanently restrained and enjoined from engaging or participating in the production or dissemination of any infomercial, and also from assisting others engaged in the production or dissemination of any infomercial." (Docket No. 350, Proposed Final J. 9, hereinafter, "Ban on Infomercials"). The FTC also asks that Gravink, Hewitt, FP and MOA be "permanently restrained and enjoined from engaging or participating in telemarketing, and from assisting others engaged in telemarketing." (*Id.,* hereinafter, "Ban on Telemarketing").

The FTC argues that given Hewitt and Gravink's history, particularly the prior lawsuits that have been filed by the FTC against them, and the amount of the consumer injury involved, a lifetime ban is warranted.[147] The parties' briefing on the duration and scope of the ban with respect to Hewitt and Gravink and the scope of injunctive relief against all individual defendants is insufficient to enable the Court to fashion the appropriate equitable relief. A number of cases the FTC relied upon in support of the lifetime ban were not included in the FTC's opening brief but appeared in the reply. Accordingly, Defendants did not have a full opportunity to address this issue. Therefore, the Court believes that additional briefing would be helpful to the Court, particularly on the issue on whether a lifetime ban is appropriate under the facts of this case.

### 2. Monetary Relief

In addition to injunctive relief, the FTC seeks equitable monetary relief in the

---

**143.** Beck Decl. ¶ 14.

**144.** Paul Decl. ¶ 5.

**145.** Alexander Decl. ¶ 5.

**146.** *See generally,* Proposed Final J. for Permanent Injunction and other Equitable Relief against Defendants (hereinafter, "Proposed Final J."). (Docket No. 350.)

**147.** Pl.'s Fact Nos. 2328–37.

form of restitution under Section 13(b). The authority granted by Section 13(b) is not limited to the power to issue an injunction. Rather, it includes the authority to grant any "ancillary relief" necessary to accomplish complete justice, including the authority to order restitution or "disgorge[ment] of unjust enrichment." *Pantron I*, 33 F.3d at 1102–1103; *Amy Travel Serv.*, 875 F.2d at 571 (stating that restitution is an "ancillary relief" authorized by Section 13(b)); *GEM Merchandising*, 87 F.3d at 469 ("Among the equitable powers of a court is the power to grant restitution and disgorgement.").

As with injunctive relief, individuals may be held liable for monetary relief in their own right for their own deceptive conduct. *Gill*, 71 F.Supp.2d at 1046; *Kitco of Nevada*, 612 F.Supp. at 1292–1293 (finding liability of individuals for their roles as principals). An individual is liable for corporate violations of the FTCA if "(1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Stefanchik*, 559 F.3d at 931.

Here, the FTC argues that Hewitt and Gravink should be held monetarily liable as owners of the corporate defendants. In addition, the FTC seeks the hold the developers of the three systems, Beck, Alexander, and Paul, personally liable for their roles as the "gurus" in the infomercials.

## A. Liability Hewitt and Gravink

For the reasons discussed above, Hewitt and Gravink are liable for equitable monetary relief for their roles as principals of FP and their control of the other corporate defendants.

## B. Liability of Beck, Alexander, and Paul

As stated previously, the gurus should be held liable for injunctive relief. For the same reasons cited above, the Court finds that the individual gurus should be monetarily liable with respect to their products.

## C. Liability of the Corporate Defendants

There is no dispute that FP developed the deceptive infomercials; JBAP, LLC, Jeff Paul, LLC, and John Alexander LLC marketed the systems, and MOA telemarketed and sold personalized coaching programs for the systems. There is also no dispute that FP is the controlling member of the other corporate defendants. "Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others." *Think Achievement*, 144 F.Supp.2d at 1011 (citing *Sunshine Art Studios*, 481 F.2d at 1175; *Delaware Watch*, 332 F.2d at 746–47). Factors in determining common enterprise include: (1) common control; (2) sharing office space and offices; (3) whether business is transacted through a "maze of interrelated companies"; and (4) commingling of funds. *Think Achievement*, 144 F.Supp.2d at 1011 (citations omitted). Here, there is no dispute that these corporate defendants are controlled by Hewitt and Gravink and they share the same business address and office space. Accordingly, the Court finds that the corporate defendants operate as a common enterprise, and each of them are jointly and severally liable for any corporate defendant's violations.

## D. Amount of Damages

Again, the Court believes that because the parties' briefing focused primarily on

liability, additional briefing is appropriate in order for the Court to determine the appropriate monetary award as to each defendant. The FTC submitted summaries of Defendants' revenue, refunds, and chargebacks by year for sales of the kits and coaching services. (Rose Decl. ¶¶ 4–7, Attach. A.) The FTC also submitted a summary of the revenue for the sale of the continuity programs. (Rose Decl. ¶¶ 10–11, Attach. B.) These summaries are allegedly based on documents produced by Defendants. (Rose Decl., Attach. B.)

However, Defendants counter that summary adjudication of the measure of damages is improper because the FTC made no effort to exclude the consumers who benefitted from the programs or to subtract the benefit of actual services rendered. (Opp'n 43.) Defendants also argue that the FTC should subtract the amounts actually earned by consumers using the educational products to avoid providing consumer windfalls. (Opp'n 43.) As the Conrey Survey shows, a small number of purchasers of the kits have benefitted from the program. Because the relief sought by FTC is grounded on equity, the FTC should, at a minimum, address why Defendants' arguments are not meritorious. In its Reply, the FTC failed to do so.

## V. CONCLUSION

For the foregoing reasons, (1) Defendants' Motion in Limine is **DENIED**, and (2) the FTC's Motion for Summary Judgment is **GRANTED**. The Court orders the parties to submit supplemental briefing and additional evidence, if any, addressing the scope of injunctive relief and the appropriate amount of monetary damages. The FTC's supplemental brief is due by **May 7, 2012**. Defendants' responsive brief is due by **May 14, 2012**. The FTC's Reply is due by **May 21, 2012**. **Each brief is limited to 15 pages.** The

Court will take the matter under submission and will schedule further hearing if it deems necessary.

**IT IS SO ORDERED.**